## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

DEVIN THIBODEAUX ET AL

CASE NO.  6:21-CV-00061

VERSUS

JUDGE DAVID C. JOSEPH

ADAM BERNHARD ET AL

MAGISTRATE JUDGE CAROL B. WHITEHURST

## REPORT AND RECOMMENDATION

This matter comes before the Court on remand from the District Court regarding Defendants' Motion to Dismiss (Rec. Doc. 24)[1]. The sole question before the Court is whether Lost Lake is navigable such that federal admiralty jurisdiction exists. The parties submitted a joint pre-evidentiary hearing statement on the issue of navigability. (Rec. Doc. 57). The Court conducted an evidentiary hearing on February 8, 2023. (Rec. Doc. 67). Considering the law, evidence, and the parties' arguments, the Court finds that federal jurisdiction exists such that Defendants' motion should be denied.

## Introduction

In Louisiana, known as the sportsman's paradise, one's rights to hunt and fish are sacred. Crawfish are an especially important commodity in south Louisiana.

---

[1]    Though Defendants' Motion to Dismiss was purportedly a motion to dismiss pursuant to F.R.C.P. Rule 12(b)(6), the Court re-characterized the motion as one to dismiss for lack of jurisdiction. Rec. Doc. 35.

These culturally crucial crustaceans are found in abundance in the renowned landscape of the Atchafalaya Basin, where the rights of private swampland owners at times clash with those of commercial crawfishermen. This case features Defendants, owners of swamp area known as Lost Lake in the Atchafalaya Basin, against Plaintiffs, seasoned commercial crawfishermen who have crawfished Lost Lake for years.

For centuries, navigability has determined the rights of use of bodies of water. See history lesson in *PPL Montana, LLC v. Montana*, 565 U.S. 576, 590, 132 S. Ct. 1215, 1227 (2012). Thus, whether a body of water is navigable often determines who can crawfish where. Navigability is a particularly daunting determination in the Atchafalaya Basin, which is, as one court described, "a dynamic and constantly evolving system of many inland rivers, channels and lakes with many potentially navigable outlets and tributaries." *Meche v. Richard*, No. CIV.A. 05-0385, 2007 WL 634154, at *6 (W.D. La. Feb. 26, 2007). Navigability is not a one-size-fits-all determination, factually or legally. The unique characteristics of each body of water—Lost Lake in this case—and the interactions among neighboring waters are critical. Additionally, the fact of navigability does not apply the same way to all cases.

2

## Factual and Procedural Background

Plaintiffs, Devin Thibodeaux and Herby Angelle, are grandfather/grandson commercial crawfishermen. Until January 25, 2020, Plaintiffs and other crawfishermen freely harvested crawfish from Lost Lake in the Atchafalaya Basin. The Lost Lake area is considered a mecca for crawfish and other wildlife avidly pursued by Louisiana sportsmen. Defendants, Adam, Seth, and Kenneth Bernhard, are such sportsmen, as are Plaintiffs Thibodeaux and Angelle; however, the Bernhards own large tracts of swampland that encompass and/or become Lost Lake. Plaintiffs do not.

On January 25, 2020, Plaintiffs were harvesting their crawfish traps in Lost Lake when Adam and Seth Bernhard allegedly intercepted Thibodeaux's skiff, verbally accosted them, and summoned a sheriff's deputy who issued criminal citations to Thibodeaux and Angelle for criminal trespassing. (Rec. Doc. 1; 3). Defendants dispute the facts of the encounter as alleged, but the facts of the encounter are irrelevant to the issue at bar. Jurisdiction is the Court's instant concern.

Plaintiffs filed suit in this Court in January 2021. Pursuant to Court order, Plaintiffs amended the complaint in October 2021 to clarify allegations regarding the location of the alleged incident in order to assist in the jurisdictional determination. (Rec. Doc. 20; 21). The amended complaint specifies that the encounter occurred "in the area known as Lost Lake" which Plaintiffs allege "is

3

replenished by the rising and falling waters of the Atchafalaya River [and] accessed by a navigable channel … connecting the Atchafalaya River with Lost Lake." (Rec. Doc. 21, ¶2(A)). Thereafter, Defendants moved to dismiss Plaintiffs' claims for lack of admiralty jurisdiction.

At the heart of the jurisdiction question, at least as Plaintiffs have framed it, is the *Grubart* framework: admiralty jurisdiction exists over claims which are 1) based upon incidents which occurred on navigable water (the location test); and 2) have a sufficient connection to maritime activity (the connection test). *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527 (1995). In addressing the first *Grubart* step, the undersigned initially concluded that Lost Lake *appeared* navigable based upon the unrebutted report of Plaintiffs' expert, Dr. Paul Kemp, and Defendants' failure to offer any counter-evidence regarding Lost Lake's navigability. (Rec. Doc. 35, p. 9). Nonetheless, the undersigned granted Defendants' motion to dismiss, finding that Plaintiffs failed to show a connection to maritime activity under the second *Grubart* step. (Rec. Doc. 35, p. 10-13).

Plaintiffs objected to the Report and Recommendation. Upon review, the District Court found that Plaintiffs' claims satisfied the connection test and remanded the case to the undersigned for an evidentiary hearing and determination of whether Lost Lake is navigable. (Rec. Doc. 40). The Court conducted an evidentiary hearing on February 8, 2023, at which Plaintiffs submitted testimony

4

from Dr. Paul Kemp, expert in the fields of hydrology, geomorphology, and sedimentology. Plaintiffs also submitted the testimony and affidavits of several crawfishermen who have harvested from Lost Lake for many years, as well as various historical and current maps of the Lost Lake area. In lieu of live testimony, Defendants submitted deposition testimony of Seth Bernhard, individuals with historical ties to the area, and their expert, Robert Wolf, professional engineer and land surveyor. Unsurprisingly, Plaintiffs' expert, Dr. Kemp, opined Lost Lake is navigable; Defendants' expert, Mr. Wolf, opined it is not.

Plaintiffs contend Lost Lake is identical to nearby Lake Rycade, also in the Atchafalaya Basin, which Judge Doherty of this Court found navigable. *Meche v. Richard*, 2007 WL 634154. Defendants, of course, disagree. Following the evidentiary hearing and review of expert reports, maps, voluminous exhibits, and deposition testimony, the Court makes the following factual findings:[2]

- Kenneth Bernhard and/or his company, Kerkas, LLC, own several large tracts of recreational property in the Atchafalaya Basin, parts of which encompass the area known as Lost Lake. The encounter in question occurred on property owned by Kerkas. (Wolf Report Rec. Doc. 65-29, p.

---

[2]     The Court's task of rendering factual findings was exceedingly difficult, due primarily to both parties' counsel's disorganization and inadequate preparation. The uniqueness of the area in question, though significant, was only a secondary difficulty. The Court expended considerably more time combing through the array of exhibits and testimony in its attempts to define Lost Lake than should have been necessary. Counsel are cautioned to review the applicable procedural and evidentiary rules and to be fully prepared with organized exhibits and witnesses prior to future hearings.

5

3; Compare maps at Rec. Doc. 65-10[3] and Rec. Do. 65-30, p. 9. See also Rec. Doc. 65-31, p. 1-23).

- Lost Lake is a perched lake[4] situated in a crook of undeveloped swampland between the Atchafalaya River and the Butte LaRose Cutoff Channel. (Rec. Doc. 65-10). Lost Lake's bottom is perched 1 to 2 feet above mean river stage at Butte La Rose. When the Atchafalaya River is at high stage (19 feet), Lost Lake is accessible in various routes through the woods. Otherwise, access to Lost Lake is only through a 10- to 20-foot-wide drainage channel from the Atchafalaya River.[5] The lake is accessible through flooding and/or the ditch about 30%, or about 110 days in the crawfish season, annually. (Kemp Supplemental Report Rec. Doc. 65-4, p. 1-2; drain channel pictured at 65-5. See also Seth Bernhard Depo. Rec. Doc. 65-37, p. 17, Depo. Pg. 63-64). It is unclear how often Lost Lake is accessible by ditch only.

- The bed of Lost Lake is approximately 11.5 feet elevation. (Kemp Report Rec. Doc. 65-3, p. 7; Kemp testimony Rec. Doc. 67 p. 111). Its ordinary high-water mark (OHWM) is somewhere between thirteen (13) feet (Wolf

---

[3]    Thibodeaux testified that the encounter occurred at the location of the red pin in the map of Rec. Doc. 65-10. (Rec. Doc. 67, p. 62-63). Kilgore, a witness in Angelle's boat, testified that the encounter occurred at the location of the red pin in Rec. Doc. 65-12. (Rec. Doc. 67, p.84-85). It is undisputed that the encounter occurred on Kerkas property.

[4]    Plaintiffs' expert, Dr. Kemp, explained that a perched lake is one in which the bottom of the lake is above the mean level of water in the surrounding river channels. (Rec. Doc. 65-4, p. 1; Rec. Doc. 67 p. 111).

[5]    The Bernhards retained Mr. Wolf in his capacity as an engineer at some point prior to this litigation to install a drainage structure near the existing drainage ditch to control erosion on their property. Mr. Wolf prepared a drainage study of the area at the request of the Corps of Engineers in order to get permits for the project; however, it appears that the Bernhards did not proceed with the project. See Wolf Report Rec. Doc. 65-29, p. 7; Rec. Doc. 65-31, p. 24-29 and Depo Rec. Doc. 65-40, p. 8-9 [Depo. P. 25-26; 29]. The Court highlights this fact to clarify that "drainage ditch" as used herein shall refer to the body of water which Plaintiffs used to access Lost Lake. "Drainage structure" shall refer to the Bernhards' unrealized project.

Dep. Rec. Doc. 65-40, p. 4-6 [Depo. P. 12-21]; Wolf Report 65-29, p. 11-12) and nineteen (19) feet (Dr. Kemp Report at Rec. Doc. 65-3, p. 8).[6]

- Lost Lake's depth at any given time can be determined based on the water levels gauged at Butte LaRose. Because it is a perched lake, with a base elevation of approximately eleven to twelve feet, when the water levels in the Atchafalaya River are below this depth, the lake dries out. At the time of the incident on January 25, 2020, the lake was about five feet deep. (Kemp Testimony Rec. Doc. 67, p. 110-13; Wolf Depo. Rec. Doc. 65-40, p. 25-37; 46 [Depo. P. 179-80]; Angelle Testimony Rec. Doc. 67, p. 53).

- Lost Lake has historically been known as a low-lying, swampy area with numerous iterations over the years. (Wolf Depo. Rec. Doc. 65-40, p. 25-31; Official Township Plat and field notes at Rec. Doc. 65-31, p. 1-21; Kemp Testimony Rec. Doc. 67, p. 135-42). It was first identified as Lost Lake on a map in 1968. (Kemp Report Rec. Doc. 65-3, p. 2; Rec. Doc. 65-8; Wolf Report Rec. Doc. 65-29, p. 5). Prior to that time, Bayou Cane was the only inlet/outlet to the low-lying, swampy area which later became known as Lost Lake. Bayou Cane ceased appearing on maps in approximately the late 1950s before Lost Lake was cartographically identified. (Wolf Report Rec. Doc. Rec. Doc. 65-29, p. 5 and maps at 65-18; 65-30; Wolf Depo. Rec. Doc. 65-40, p. 39 [Depo. P. 151-52]; Kemp Testimony Rec. Doc. 67, p. 143 referencing map at Rec. Doc. 65-11). Bayou Cane provided access into the Lost Lake area only when the water was high, but by 1973, Bayou Cane "silted up" and ceased providing any access. (Barras Testimony Rec. Doc. 67, p. 98-103; Kemp Testimony Rec. Doc. 67, p. 142).

- The Corps of Engineers dug the Butte LaRose Cutoff Channel likely sometime before the 1930s. (Wolf Depo Rec. Doc. 65-40, p. 16 [Depo. P. 59-60]). Although it is probable that Bayou Cane communicated with Lake Warner (a state-claimed navigable lake across the Cutoff Channel from the

---

[6]     The experts disagreed regarding the OHWM; however, Dr. Kemp testified that experts can be reasonably expected to use different methods of calculating OHWM and thereby reach variant conclusions. Rec. Doc. 67, p. 136-37. The Court will not resolve this factual issue at this stage, because, as further discussed below, the answer does not definitively establish the jurisdictional issue.

Lost Lake area) during its existence (before the Butte LaRose Cutoff Channel was developed) (Kemp Testimony Rec. Doc. 67, p. 149-50 referencing Rec. Doc. 65-18), no evidence shows that Lost Lake ever communicated with Lake Warner. (Wolf Depo Rec. Doc. 65-40, p. 33 [Depo. P. 125-26] and p. 41 [Depo. P. 158]).[7]

- At some point in the late 1960s, a drainage ditch appeared from the Atchafalaya River to the Lost Lake area. (Wolf Report Rec. Doc. 65-29, p. 9). The drainage ditch first appeared definitively on a map in 2015. (Wolf Report 65-29, p. 6 and Wolf Depo. Rec. Doc. 65-40, p. 35-35 [Depo. P. 136-37]. Prior to that time, in the early 1960s, those fishing the area had to carry their boats over land to access Lost Lake. There was not a waterway which accessed the lake. (Thomas Poche Dec. Rec. Doc. 65-34; Robert Poche Dec. 65-35; the Poches' Depo. 65-38, p. 8 [Depo. P. 25-27]; Dr. Phil Mayers Depo. Rec. Doc. 65-36, p. 11-12; 17-19). Over the past several decades, the drainage ditch grew, likely due to erosion, from a small ditch to a larger body of water through which small boats, such as Plaintiffs' crawfish skiff, could pass at certain times when the water was high enough. (Seth Bernhard's Depo. Rec. Doc. 65-37, p. 17-18 [Depo. P. 62-65]; Kilgore testimony Rec. Doc. 67, p. 80-81).

- At the time of the incident in January 2020, the drainage ditch was the only means of accessing Lost Lake by water. The drainage ditch transects property owned by Kenneth Bernhard and/or Kerkas, LLC. (Kerkas 30(b)(6) Depo. Rec. Doc. 65-42, p. 8 [Depo. P. 25-27]; Wolf Report Rec. Doc. 65-29, p. 5 and maps at 65-30).

---

[7]    Plaintiffs submitted the Declaration of Harold Schoeffler who attested that "before the Butte Larose Cut was dug by the Corps of Engineers, Lost Lake communicated with Lake Warner…" (Rec. Doc. 65-26, ¶10). The Court attributes no weight to this lay testimony seemingly based upon the same map which Mr. Wolf testified cannot prove that Lost Lake communicated with Lake Warner. Contrarily, Mr. Wolf opined that higher land likely separated Lake Warner and the Lost Lake area, thereby precluding a finding of communication between the two waters. (Rec. Doc. 65-40, p. 33 [Depo. P. 126-27]). See also Kemp Testimony at Rec. Doc. 67, p. 148-49.

- Crawfishermen have used Lost Lake for generations. (Declarations at Rec. Doc. 65-23 through 65-26[8]). Kenneth Bernhard allowed people to crawfish on his private property so long as the crawfishermen did not interfere during hunting season due to safety concerns. (Seth Bernhard Depo. Rec Doc. 65-37, p. 18, Depo. P. 66-67).

- The State of Louisiana does not assert ownership over Lost Lake and does not consider it navigable. (Rec. Doc. 65-33; Wolf Report Rec. Doc. 65-29, p. 3; 65-30, p. 2).

- The St. Martin Parish Sheriff's Office issued citations to Plaintiffs and others crawfishing in the area for criminal trespassing in violation of La. R.S. 14:63. (Citations Rec. Doc. 65-1; 65-2; Sgt. John Dauphine Depo Rec. Doc. 65-39, p. 6-10).

## Law and Analysis

A body of water is navigable in law when it is navigable in fact. *PPL Montana, LLC v. Montana*, 565 U.S. 576, 591–92, 132 S. Ct. 1215, 1228 (2012), citing *The Daniel Ball,* 10 Wall. 557, 19 L.Ed. 999 (1871). It is navigable in fact when it is "used, or [] susceptible of being used, in [its] ordinary condition, as [a] highway[] for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *Sanders v. Placid Oil Co.,* 861 F.2d 1374, 1377 (5th Cir. 1988), quoting *The Daniel Ball*. A body of water constitutes navigable

---

[8] All declarations made by various crawfishermen attested to their personal crawfishing experiences as well as purported facts based upon various maps and the "hydrological and geomorphological history and communications with the Atchafalaya River, from creation to their current states." Rec. Doc. 65-23, ¶10-12. See also Rec. Doc. 65-24, ¶9-10; 65-25, ¶9-10. The Court declines to attribute weight to such hefty statements where the parties have retained qualified experts and have submitted the various maps and their experts' interpretations.

waters of the United States when it forms "in [its] ordinary condition by [itself], or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in which such commerce is conducted by water." *Id*.

The Court is guided on its quest for navigability answers by a series of relevant cases. In 1988 in *Sanders v. Placid Oil Co.,* the Fifth Circuit considered whether admiralty jurisdiction existed for a duck hunter's tort claim against an oil company, whose submerged pipe in Catahoula Lake caused a boating accident. The court held Catahoula Lake was navigable. *Sanders*, 861 F.2d 1374.

In 2007, Judge Doherty of the Western District considered the propriety of admiralty jurisdiction over froggers' tort claims arising out of an incident in Lake Rycade, located just a few miles from Lost Lake in the Atchafalaya Basin. *Meche*, 2007 WL 634154. Judge Doherty analogized Lake Rycade to Catahoula Lake and applied *Sanders'* reasoning to conclude that Lake Rycade was navigable. Plaintiffs' rest their entire claims on the premise that Lost Lake is identical to Lake Rycade. They employed the same expert who testified in *Meche*, Dr. Kemp, to opine that Lost Lake and Lake Rycade have the same OHWM and are characteristically identical.

Later in 2007, the Fifth Circuit considered a leisure fisherman's §1983 claim against a sheriff who arrested him for trespassing on Gassoway Lake in East Carroll

Parish. *Parm v. Shumate*, 513 F.3d 135, 140 (5th Cir. 2007). The court considered whether Gassoway Lake was navigable in fact to determine whether the fisherman had a navigational servitude to fish the lake as a public water.[9] The court held that Gassoway Lake was not navigable, but, rather, privately-owned flood land. *Id*. at 140.

Most recently, in March 2023, the Fifth Circuit considered the navigability of a flooded channel which was dry roughly 67 percent of the time and was connected to Bayou D'Arbonne. *Newbold v. Kinder Morgan SNG Operator, L.L.C.,* No. 22-30416, 2023 WL 2487267, at *1 (5th Cir. Mar. 14, 2023). Relying on *Parm*, the court found the channel was non-navigable and held that the plaintiff did not possess a navigational servitude. *Id*. at *4-5.

In harmonizing the foregoing jurisprudence and the facts of this case, the Court observes three predominant themes in determining navigability of a lake: seasonal navigability, whether the waterway constitutes a "highway," and whether the water is situated on private property or regulated to any degree by the government.

---

[9]    Defendants failed to cite *Parm* or any other case in an attempt to distinguish Lost Lake from Lake Rycade, instead relying primarily upon *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999) to argue that the court should look to where the alleged wrong took effect rather than to the locus of the allegedly tortious conduct. The Court finds *Egorov* and the question of where the tort's effect occurred irrelevant. Plaintiffs' suit seeks to establish a right to crawfish in Lost Lake, the navigability of which is the sole inquiry.

## I.    __Seasonal Navigability.__

The evidence shows that Lost Lake is accessible by boat only through a drainage ditch which appeared to develop in the late 1960s as a small ditch which has since eroded into a skiff-accessible channel. The ditch provides boat access only when the water in the Atchafalaya River is high enough. According to Dr. Kemp, boats can access Lost Lake either through flood waters and/or the drainage ditch for about 110 days, or about 30%, annually. (Kemp Report Rec. Doc. 65-4, p. 1-2). It is unclear how many days Lost Lake is accessible by ditch alone. Therefore, Plaintiffs argue, Lost Lake is at least seasonably navigable just as Lake Rycade in *Meche* and Catahoula Lake in *Sanders*.

Although Lake Rycade and Catahoula Lakes were both ultimately found to be navigable, both Judge Doherty and the Fifth Circuit held that seasonal navigability does not preclude a finding of navigability. *Meche*, at * 3; *Sanders*, 861 F.2d at 1377. In other words, seasonal navigability does not render a lake non-navigable as a matter law. *Id*. Extending this logic, neither does seasonal navigability dictate a finding a navigability. Rather, the Court must apply *The Daniel Ball* test and, as further discussed below, consider the purpose for which the navigational test is applied.

## II.    <u>The Water as a Highway.</u>

*The Daniel Ball* standard for navigability bears repeating:  a body of water is navigable in fact when it is "used, or [] susceptible of being used, in [its] ordinary condition, as [a] highway[] for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *Sanders,* 861 F.2d at 1377, quoting *The Daniel Ball*. Likewise, a body of water constitutes federal navigable waters when it forms in its ordinary condition alone, or by united with other waters, "a continued highway over which commerce is or may be carried on with other states…" *Id*. The law's emphasis on a lake's function as a "highway" is instructive.

In *Sanders*, the court found that Catahoula Lake was navigable as a continuous highway for commerce notwithstanding an artificial dam structure that controlled the water levels:

> The evidence in the record supports the district court's finding that the Little River, which is formed by the meeting of the Dudgemona River and Bayou Castor, flows in a southerly direction into the lowlands that become Catahoula Lake at high water. From Catahoula Lake the water is discharged through several tributaries and distributaries until the tributaries finally rejoin into one channel at Archie, Louisiana. In May 1972, engineers of the U.S. Army Corps of Engineers completed a diversion canal over one of the distributaries that acts as a permanent dam structure, foreclosing navigation except during flood stages. In 1973, the Corps constructed a weir across the span of the Little River at Archie. Thus, the water level of the lake is maintained from the outflow of the lake up to the weir itself at thirty-six feet above sea level. The water level of the lake is controlled by movable gates in the permanent dam across the diversion canal. As a

13

result, when the water level of the Little River is higher than thirty-six feet above sea level, vessels may pass over the weir. The weir, then, although permanent, is not a constant obstruction to navigation, as indicated by our previous review of the percentages of navigable access. From Archie, Louisiana, the water flows until it eventually joins the Black River. The Black River runs into the Red River which eventually allows passage to either the Gulf Intracoastal Canal or the Mississippi River. A small but steady barge trade is conducted on the Black and Red Rivers, and the Mississippi River, of course, is a major maritime commercial artery. Accordingly, the district court properly found that these waters form a continuous highway between states over which commerce can be conducted.

*Sanders*, 861 F.2d at 1377-78.

Likewise, in *Meche*, the court found that Lake Rycade was a highway for commerce, finding substantial factual similarities to Catahoula Lake.

[T]his Court looks to the testimony of various witnesses who indicated they have or have not been able to travel from the Whiskey Bay Pilot Channel into Lake Rycade through Meche Bayou and from the Atchafalaya Basin into Lake Rycade through Bayou LaRompe, and traversing across Lake Rycade thus creating a "shortcut" for travel through the Atchafalaya Basin waters.

*Meche*, at * 7.

Based on the credible and persuasive testimony of both Mr. Steven and Jody Meche and Mr. Mason, this Court finds that Lake Rycade is sufficiently connected to and communicating with the Whiskey Bay Pilot Channel through slough B and also with the Atchafalaya River through the northwest quadrant of Lake Rycade that the waters form or unite with the overall navigable waterways of the United States that are used for commerce on a daily basis, particularly for oil and gas commerce in addition to fishing and hunting. The Court finds these waterways ultimately make their way through the Vermilion Bay into the Gulf of Mexico, such that they constitute a continued highway over which commerce is or may be carried on with other States or foreign countries in which such commerce is conducted by water.

*Id*. at *12.

Unlike Lake Rycade and Catahoula Lake, Lost Lake is accessible (seasonally) only through a ten-to-twenty-foot-wide drainage ditch. (Kemp Report Rec. Doc. 65-3, p. 3). The evidence indicates that Bayou Cane historically traversed the area (Wolf Report Rec. Doc. 65-29), but Bayou Cane is no longer (if it ever was) a navigable access point. By the time Lost Lake was first identified on a map in 1968, Bayou Cane had disappeared. (Wolf Report Rec. Doc. 65-29, p. 5; Wolf Depo Rec. Doc. 65-40, p. 44 [Depo. P. 170-72]). There is no evidence that Lost Lake ever functioned as a highway between otherwise navigable channels. Lost Lake has never served as a shortcut or connected to or communicated with the Atchafalaya River, the Butte LaRose Cutoff Channel, or Lake Warner, except as the Atchafalaya's flooding happens to periodically allow boats to stray beyond the river's ordinary channel or as the river becomes high enough to sufficiently fill the drainage ditch.[10]

Defendants' expert, Robert Wolf, opined that Lost Lake should not be classified as a lake, but an area which accumulates rising river backwater during high stages and drains from the drainage channel. (Wolf Report Rec. Doc. 65-29, p.

---

[10]  The Court rejects Dr. Kemp's testimony to the extent it can be interpreted as a conclusion that Lost Lake communicated with the Atchafalaya River. Even Dr. Kemp admitted to being confused by the questioning (Rec. Doc. 67, p. 148-49), and most lay witnesses agreed that the drainage channel has provided the only access in recent decades.

5-6; 12; Wolf Depo. Rec. Doc. 65-40, p. 38 [Depo. P. 147-48]).). Dr. Kemp's opinion focused on the area's OHWM, a determination which this Court finds inconsequential to whether Lost Lake forms a highway. Indeed, neither *Meche* nor *Sanders* relied upon OHWM as an indication of navigability. Rather, as discussed below, OHWM could be important evidence in Plaintiff's right to use the drainage ditch and Lost Lake, if any. Otherwise, Dr. Kemp did not contradict Mr. Wolf's description of Lost Lake as privately owned property which accommodates flood waters from the nearby river. In this regard, Lost Lake is similar to *Parm's* Gassoway Lake, which was likewise located on private property subject to seasonal flooding:

> The water levels of the Mississippi River fluctuate seasonally. In East Carroll Parish, the normal low water mark is seventy-seven feet above mean sea level. Yet during the spring season the river floods well beyond its normal channel—as a result of increased rainfall and snow melt in the North—and the river regularly rises to as high as one hundred and twelve feet above mean sea level. It is normal for the river to remain at this level for at least two months.

> The Property is located in East Carroll Parish. On its eastern side, the Property is bound by the Mississippi River, and on its western side, it is bound by the Mississippi River's levees. Buildings, crop lands and forests, with trees as tall as one hundred and forty feet, are located on the Property. In addition, waterways known as Gassoway Lake, Little Gassoway Lake, and other bodies of water are contained within its boundaries. Gassoway Lake, which Plaintiffs consider the most ideal venue for fishing on the Property, is located on the Property's western side, nearly three-and-a-half miles from the ordinary low water mark of the Mississippi River and its channel. Gassoway Lake is connected by a man-made drainage ditch to Bunch's Cutoff, which, in turn, flows into the Mississippi River. When the river floods in the spring, Gassoway Lake, along with the rest of the Property, is submerged under its waters.

*Parm*, 513 F.3d at 137–38.

The Fifth Circuit gave accord to the underlying Louisiana court's ruling that Gassoway Lake was not a navigable body of water in fact. *Id*. at 139-40, citing *Walker Lands, Inc. v. E. Carroll Par. Police Jury*, 38,376 (La. App. 2 Cir. 4/14/04), 871 So. 2d 1258, 1266, *writ denied,* 2004-1421 (La. 6/3/05), 903 So. 2d 442. The court emphasized the Louisiana court's finding that Gassoway Lake was flooded private property:

> Gassoway Lake and surrounding lands between the lake and the river are sometimes flooded by the Mississippi River. Privately owned land does not become part of a navigable body of water when a nearby navigable body of water overflows its normal bed and temporarily covers the property. Gassoway Lake is landlocked and does not now lie in the bed of the Mississippi River, which is some three and one-half miles to the east; likewise, it is not a channel of the river, since it is cut off from it.

> *Parm*, 513 F.3d at 140, quoting *Walker Lands, Inc*, 871 So. 2d at 1264.

(citations omitted).

Comparing *Meche's* Lake Rycade and *Parm's* Gassoway Lake hydrologically and geographically, Lost Lake could reasonably be either navigable or non-navigable. The dividing line is as ambiguous as it is critical, so the Court looks further in search of a resolution.

### III.    Ownership and Authority.

A final significant, though non-determinative, consideration is whether the body of water in question is located on private property or claimed or controlled by the government on behalf of the public. Of course, the government (be it state or federal) controls navigable waters on the public's behalf. In *Sanders*, the court noted that "the Corps [of Engineers] considers the Little River and Catahoula Lake to be navigable waters of the United States, maintains structures throughout the system, and requires Placid to have a permit that governs the placing of structures in those waters," facts which the court considered evidentiarily significant. *Sanders*, 861 F.2d at 1378. Likewise, Judge Doherty in *Meche* found significant that the Louisiana Department of Wildlife and Fisheries considered Lake Rycade navigable "and spent substantial financial and other efforts at eliminating or otherwise reducing the growth of vegetation that impeded access to the lake." *Meche* at *8. The court further inferred jurisdiction by the Corps of Engineers who issued a cease-and-desist order when a neighboring hunting club attempted to dig access to the lake and the Atchafalaya River. *Id.* at *11.

Contrarily, undisputed evidence in this case shows that the land which becomes Lost Lake and which the drainage ditch transects is privately owned. (Wolf Report Rec. Doc. 65-29; maps at Rec. Doc. 65-30, p. 2). When asked to identify any claims to waters in the area, the state of Louisiana did not claim the Lost Lake area.

18

(Rec. Doc. 65-33; 65-30). By comparison, as shown on a map presented as evidence in this case, Louisiana claims a large portion of Lake Rycade. (Rec. Doc. 65-30, p. 2[11]). Historical evidence supports Louisiana's position. Pursuant to the equal footing doctrine, "Louisiana, upon attaining statehood, received ownership of all navigable waters within its borders and all tide waters and the lands under them from the United States in public trust." *Dardar v. Lafourche Realty Co.,* 985 F.2d 824, 826–27 (5th Cir. 1993) ("*Dardar I*"). Thus, waters which were non-navigable at the time of Louisiana's statehood in 1812 were not conveyed to the public trust. *Id*. See also the Louisiana Supreme Court's detailed discussion in *Gulf Oil Corp. v. State Min. Bd.,* 317 So. 2d 576 (La. 1974). Under Louisiana law, "navigable water bottoms … are public things insusceptible of private ownership." *Id*. at 582-88. Hence, the state's unchallenged recognition of private ownership of the land which floods to become Lost Lake supports a finding of non-navigability.

Lost Lake did not exist at the time of the first available map, the Township Plat of 1831. (Wolf Depo. Rec. Doc. 65-40, p. 23 [Depo. P. 85-86]; map and field notes at Rec. Doc. 65-31, p. 1-21). In the absence of conflicting evidence, the Court draws the reasonable inference that Lost Lake was not recognized at the time of

---

[11]     Lake Rycade is located southeast of Lost Lake, across the Atchafalaya River from Lost Lake and between the Atchafalaya River and the Whiskey Bay Pilot Channel. This map, though dated December 2022, is consistent with the evidence presented in *Meche* that the state exercised some level of responsibility over the area.

Louisiana's statehood in 1812. As such, Lost Lake was never conveyed to the public trust. Further, the St. Martin Sheriff issued citations to Plaintiffs for criminal trespassing, thereby implying recognition that the property was owned by another. (Rec. Doc. 65-1; 65-2).

Plaintiffs have also failed to present any evidence that the Corps exercised authority over Lost Lake. Mr. Wolf testified that Defendants engaged him prior to this litigation to build a "drainage structure" in the vicinity of the existing drainage ditch. According to Mr. Wolf, in applying for a permit from the Corps, he was to ascertain whether the area drained. He later confirmed that the area drained; however, the project was never completed and the permit (which was not introduced into evidence) was pulled. (Wolf Report Rec. Doc. 65-29, p. 7; Rec. Doc. 65-31, p. 24-29 and Depo Rec. Doc. 65-40, p. 8-9 [Depo. P. 25-26; 29]). The maps created for the proposed drainage structure project indicate it was to connect to the Atchafalaya River. (Rec. Doc. 65-31, p. 25). The Atchafalaya River being a navigable waterway falls within the Corps' jurisdiction and thus implicates federal regulations. Plaintiffs presented no evidence that the Corps otherwise exercised jurisdiction over the Lost Lake area or the drainage ditch.

The Court finds that private ownership of all the land encompassing Lost Lake—private ownership undisputed by Louisiana and supported by the historical maps—is a significant fact that militates against a finding of navigability. If

Louisiana is unwilling to recognize Lost Lake as a navigable waterway within its borders, and the federal government has not recognized a right to regulate Lost Lake, this Court is hesitant to challenge that recognition absent more compelling evidence that Lost Lake sufficiently communicated with the Atchafalaya River as a continuous highway rather than low-lying swamp which hosts Atchafalaya flood waters.

### IV.    **Lagniappe**

The encounter at the heart of this suit occurred on Lost Lake, a privately owned, non-state claimed, flood-prone area, which standing alone, without the seasonal access provided by the drainage ditch, is not navigable. But what of the drainage ditch, which has permitted limited navigation relatively recently?

The question of the ditch's navigability places this case at the crossroads of *Sanders*/*Meche* and *Parm*/*Newbold*. The key to reconciling these cases is the fact of private ownership. In the former line of cases, Catahoula Lake and Lake Rycade were seemingly not on private land (or at least the issue was not raised beyond the context of governmental control). In the latter line of cases, the court analyzed bodies of water situated on private land to determine the existence of a navigational servitude. In a case such as this, where a body of water located on private land might otherwise be navigable, the question of use, which Plaintiffs indubitably seek, turns

on whether a navigational servitude exists. A finding that the drainage ditch was navigable in fact would not necessarily entitle Plaintiffs to crawfish Lost Lake.

Setting the stage for *Parm* and *Newbold* were two Fifth Circuit opinions regarding the right to use a network of navigable canals on private property in coastal Louisiana. *Dardar I*, 985 F.2d at 826; *Dardar v. Lafourche Realty Co.,* 55 F.3d 1082, 1083 (5th Cir. 1995) ("*Dardar II*"). In those cases, commercial fishermen sued the owner of swampland for the right to fish various canals which had been dug on the private property. The court held that no navigational servitude existed over otherwise navigable waters dredged on private property with private funds. *Dardar I*, 985 F.2d at 833. For canals made naturally navigable by erosion, the court must apply the test set forth in *Kaiser Aetna v. United States* to determine whether a navigational servitude exists. *Id*. The court explained:

> At the threshold we note that, generally, "a navigational servitude is ordinarily imposed on a naturally navigable waterway." The servitude is not visited upon a waterway made navigable by the direct actions of man which does not displace a naturally navigable waterway. Waters so encumbered are subject to public use as "continuous highways for the purpose of navigation in interstate commerce." Although this servitude "recognizes the important public interest in ... interstate waters that in their natural condition are in fact capable of supporting public navigation," this interest is not absolute and the imposition of the servitude is not automatic. A landowner whose properties contain navigable waterways may escape this servitude by showing either that the waterways were not navigable in their natural state or, if naturally navigable, by demonstrating that his interests outweigh those of the public. In evaluating these competing interests, courts must determine whether: the waterway was navigable in its natural state and is comparable to other waterbodies upon which

the servitude has been imposed; is on private property and made navigable with private funds; and was made navigable by actions approved by the Corps of Engineers.

*Dardar II*, 55 F.3d at 1084-85 (citations omitted).

As in the *Dardar* cases, the heart of Plaintiffs' claims in this case is the right to access Lost Lake via the drainage ditch for crawfishing and damages for not being allowed to do so. The Court cannot at this point in the proceedings determine how the *Kaiser Aetna* factors might be applied in this case, whether a navigational servitude (state or federal) exists, whether any such servitude extends to Lost Lake, the ditch, none, or both, or how the ditch's seasonal flooding affects any potential servitude. To the latter point, see *Parm*, 513 F.3d at 143, fn. 4, noting the difference in Louisiana and federal rights of use as determined by the high-water mark. Compare also the expert testimony in this case to the discussion in *Newbold*, at *2-3, regarding the impact of vegetation and other physical characteristics on navigational servitudes. These conclusions should be reached after presentation of evidence and argument tailored to those issues perhaps through summary judgment or after trial. Jurisdiction being the Court's primary concern, the Court finds that the *possibility* of a federal navigational servitude warrants the exercise of federal question jurisdiction under 28 U.S.C. §1331.

Having found federal court jurisdiction is at least appropriate under §1331, and given the unique legal and factual circumstances of this case, the Court declines

to explicitly find that Lost Lake is navigable in fact for purposes of admiralty jurisdiction. The Court is hesitant to predetermine navigability in fact for two reasons.

First, the determination of admiralty jurisdiction appears to be a distinction without substance. Plaintiffs have pled a claim for conversion, the elements of which are the same under either maritime or Louisiana law and will nonetheless require a determination of rights to use (i.e. navigational servitude). *Mid-Gulf Shipping Co. Inc. v. Energy Subsea LLC*, 472 F. Supp. 3d 318, 324 (E.D. La. 2020). Similarly, although Plaintiffs accuse Defendants of piracy, neither Louisiana nor federal law recognizes a cause of action for such in this context.[12] Hence, federal question jurisdiction is as useful as admiralty jurisdiction in terms of the outcome Plaintiffs seek.

Second, *The Daniel Ball* standard for navigability is not applied equally to all legal issues. See *PPL Montana, LLC*, 565 U.S. at 592, identifying a non-exhaustive list of applications of the navigability test to different cases. In other words, a body of water navigable in fact for admiralty jurisdiction may not be suitably navigable

---

[12] In federal law, a cause of action for piracy *may* exist in cases of international law (see *Nestle USA, Inc. v. Doe*, 210 L. Ed. 2d 207, 141 S. Ct. 1931, 1937 (2021) and for cyber-piracy. In Louisiana, one could potentially be liable for tree piracy (La. R.S. 3:4278.1; *Entergy Louisiana, Inc. v. James*, 42,826 (La. App. 2 Cir. 1/23/08), 974 So. 2d 838, 843). Obviously, these potential claims are not applicable here.

for purposes of imposing a servitude. As illustrated by *Sanders/Meche* versus *Parm/Newbold*, seasonal navigation does not preclude a finding of navigability in the admiralty context (*Meche* and *Sanders*); however, the fact that flooding creates seasonable access could significantly impact one's right to a navigational servitude (*Parm* and *Newbold*). Therefore, the Court can postpone (perhaps indefinitely) a finding of navigability for admiralty purposes without prejudicing Plaintiffs' claims or choice of federal court forum.

Accordingly, the Court finds that the most logical approach is to exercise jurisdiction on the grounds of federal question with supplemental jurisdiction over Plaintiffs' state law claims. The parties may therefore proceed with their causes and defenses on the merits, and particularly whether Plaintiffs had a navigational servitude to crawfish Lost Lake at the time of the alleged crawfish conversion.[13]

### Conclusion

For the reasons discussed herein, the Court recommends that Defendants' Motion to Dismiss for lack of jurisdiction (Rec. Doc. 24) be denied.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this

---

[13]    Should Plaintiffs amend their complaint to state uniquely maritime claims specifically calling for admiralty jurisdiction, the court may then re-consider navigability in the context of admiralty jurisdiction. As the pleadings stand, the Court appreciates no practical reason to assert admiralty jurisdiction, where federal court jurisdiction is available otherwise.

report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. §636(b)(1).

THUS DONE in Chambers, Lafayette, Louisiana on this 11th day of April, 2023.

_____
CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE